BROOKS

v.

AUTO WHOLESALERS, Inc. et al.

No. 1393.

Municipal Court of Appeals for the District of Columbia.

Argued Oct. 26, 1953.

Decided Dec. 4, 1953.

Frederick A. Ballard, Washington, D. C., Dyer J. Taylor, Washington, D. C., on the brief, for appellant.

William R. Lichtenberg, Washington, D. C., Joseph Luria, Washington, D. C., and William Bogen, Washington, D. C., on the brief, for appellees.

Before CAYTON, Chief Judge, and HOOD and QUINN, Associate Judges.

CAYTON, Chief Judge.

Auto Wholesalers sold a used automobile to Brooks, and took from him a conditional sale agreement and a promissory note covering the deferred purchase price. These instruments were negotiated to Consolidated Auto Investment Corp. Thereafter Brooks sued Auto Wholesalers and Consolidated to have both instruments declared void and for the return of the money he had paid in the transaction. He also demanded reimbursement for monies he had spent in repairing the automobile. He charged fraud, breach of warranty, and usury. The trial court found against him on all issues and awarded judgment against him in favor of Consolidated for the balance claimed on the note.

We first consider Brooks' claim of fraud. The gist of his testimony was that he had been induced to make the purchase by a salesman's oral promise, made with no intention of fulfillment, that if he was not satisfied he could return the car within 90 days and receive his money back. No such provision was in the written contract and the salesman denied making such a promise. The trial judge specifically found as a fact that no fraudulent representations had been made. This finding was supported by substantial evidence and is not subject to reversal.

Appellant also asserts that the salesman stated the car was in good running condition, when in fact he had no personal knowledge of its running condition, but based his statement on the general appearance of the car and the fact that it bore a yellow tag indicating that it had been through the shop for repair. This, we are told, amounts to an actionable misrepresentation, because made without knowledge of its truth or falsity. But the evidence does not show it to have been false. There was evidence that repairs were required soon after the car was purchased, but there was nothing to establish that such repairs were made necessary by defects existing at the time of sale. The testimony of appellant's own expert was that the troubles were such as might develop suddenly and without previous warning.

Appellant's next point is that the written warranty provided that the car would re-

main in good running condition for 90 days, that it did not remain in good running condition, and that, therefore, he had the right to rescind. But it is plain that the agreement only warranted that the seller would, in the event the car failed to remain in good running condition, repair it at a cost 25% below the normal charge for such service. There was no proof that such warranty was breached.

More serious, and more difficult as well, is appellant's charge of usury. The cash price of the automobile was $895, of which appellant paid $300 down, leaving a balance of $595. He was required to purchase insurance, for which the premium was $91.73. Finance charges were $276.27, leaving a total time balance of $963.

■ Appellant contends that the insurance premium must be regarded as an exaction of interest because the policy was improperly countersigned. But the trial court found, on sufficient evidence, that the premium had been paid over to the insurance company and accepted by it, that the policy was binding and the insurance legally effective. We agree that since appellant had the benefit of insurance protection, he cannot be heard to say that the premium was really an interest charge.

This brings us to the critical issue in the case: What was the legal status of the remaining difference? Was it a legitimate finance charge or was it usury? We have twice in recent years had occasion to announce and apply the generally accepted rule that a sale of personalty at a time price, under a conditional sale contract providing for payment for insurance, financing and other related services for the privilege of buying on time instead of by cash, does not violate our usury statute.[1]

■ Appellant does not challenge the correctness of those decisions but stresses the argument that he as purchaser was given no real choice between a cash price and a time price. We think, however, that

this argument must fail in view of the specific finding of fact made by the trial judge "that the finance charge was included in the total contract price * * * and that the sale was at a time price for the privilege of buying on time rather than by cash. The charge was not included as payment for a loan or the forbearance of a debt, but was a part of the purchase price of the automobile which the plaintiff agreed to pay." The evidence supported this finding and we cannot override it.

■ The finding of fact just quoted also makes it unavailing for us to consider another contention of appellant: that the contract was in violation of law because both the dealer and the finance company were in the business of lending money at more than six per cent without first procuring a license under the "Loan Shark Law." Code 1951, § 26–601 et seq. Since we must refrain from overruling the finding that there was no loan of money, we would have no right to apply the sanctions of the Loan Shark Law.

Appellant relies heavily on, and asks us to follow, a recent decision of the Supreme Court of Arkansas. Hare v. General Contract Purchase Corp., 1952, 220 Ark. 601, 249 S.W.2d 973, 978. There the court made a thorough re-examination of this general subject and after pointing out that finance companies had seized on the "credit price rule" as a means of obtaining illegal interest upon "what is in form a sale, but is in substance, a loan", made a carefully considered departure from certain of its earlier decisions. Making three basic pronouncements for the protection of the buying public, the court ruled:

(1) "We leave unimpaired the doctrine that a seller may, in a bona fide transaction, increase the price to compensate for the risk that is involved in a credit sale. But there may be a question of fact as to whether the so-called credit

1. District of Columbia v. Hamilton Nat. Bank, 1950, D.C.Mun.App., 76 A.2d 60; Lincoln Loan Service of Takoma Park v. Motor Credit Co., 1951, D.C.Mun.App., 83 A.2d 230.

price was *bona fide* as such, or only a cloak for usury."

(2) If the seller, whether or not he has quoted two prices of cash or credit to the purchaser, then transfers the *title documents to a finance company which is thereby enabled to obtain more than legal interest on its investment,* "then a question of fact arises as to whether the seller increased his cash price with the reasonable assurance that he could so discount the paper to such individual or finance company. If that reasonable assurance existed then the transaction is in substance a loan, and may be attacked for usury."

(3) "When finance companies or purchasers of title paper supply dealers with *a set of forms and a schedule for credit price increases,* such will tend to show that the dealer had reasonable assurance that such finance company or purchaser of the paper would take the paper at such discount."

■ With the first ruling we are in complete and sympathetic agreement. Indeed we have applied it in this case. But the "question of fact" having been decided adversely to the purchaser precludes a ruling by us that there was a loan or that the sale was a "cloak for usury."

■ The second ruling is, we think, too strict to be laid down as a rule of law to be followed in all cases. We think it does make a difference whether the seller has quoted *two prices or not,* and we think it cannot be correctly said that merely because a merchant had "reasonable assurance" that he could *sell conditional sale paper to a finance company,* this without more stamps the transaction as a loan instead of a sale. *Installment credit business* depends to a large extent on the ability of merchants to convert outstanding accounts into cash. In our zeal to protect the public against usurers, we must not forsake basic and tested principles of law. Accordingly, we must rule that while it is correct and wise to explore to the fullest every detail of the relationship and the working arrangements between seller and finance company, it will still usually be a question of fact whether a given transaction was a loan or a sale. The great weight of authority supports the position we have taken.[2]

The third ruling in the Hare case, dealing with the supplying of forms by finance company to dealer, has already been considered in this jurisdiction. Palmer v. Associates Discount Corporation, 74 App.D. C. 386, 124 F.2d 225. No claim of usury was involved, but the dealer was charged with misrepresentation and the finance company was charged with having been on notice thereof and hence with not being a holder in due course. The court gave close scrutiny to the arrangements between the dealer and the finance company and held that because the relationship was a close and flexible one and because the finance company was the dealer's agent for collection it did not enjoy the status of a holder in due course, and that there was enough before the court to cast doubt on its good faith status. Undoubtedly the same approach should be used when usury is charged. But the facts in this case, and the form of contract as well, are different,[3] and we are again led back to the necessity of holding that the finding of no loan was supported by the evidence.

■ There is another matter not mentioned in the judge's memorandum, and not separately assigned as error, to which we think it is proper to refer. It was shown that a man named Michelson was president and treasurer of the dealer company, Auto Wholesalers, and that he held the same offices in the finance company,

2. See, e.g., Bell v. Idaho Finance Co., 1953, 73 Idaho 560, 255 P.2d 715. See also cases collected in Harper v. Futrell, 164 S.W.2d 995, 143 A.L.R. 238; Commercial Credit Co. v. Tarwater, 215 Ala. 123, 110 So. 39, 48 A.L.R. 1442; Standard Motors Finance Co. v. Mitchell Auto Co., 173 Ark. 875, 293 S.W. 1026, 57 A.L.R. 880; 55 Am.Jur., Usury § 23.

3. That appeal was from a judgment on the pleadings, while this is the result of a finding after trial.

Consolidated; that he owned 99 per cent of the stock in Auto Wholesalers and 26.9 per cent of the stock in Consolidated, and that practically all the rest of Consolidated stock was owned by Michelson's company, Auto Wholesalers. We think that if the case turned on the question of the relationship between the two companies, a different result would have been indicated. The single ownership, along with other evidence of the working arrangement between the two companies, would raise a serious doubt as to whether this was the conventional relationship between two separate companies. But again, and not without some reluctance, we must return to the primary ruling made below, that the transaction was a sale and not a loan. Suspicious though the circumstances were, the evidence was not so compelling as to require a ruling that appellant was the victim of a usurious scheme.

Affirmed.